Good morning, Your Honors. I'm Heather Rogers. I'm also from the Federal Defenders of San Diego and I represent Mr. Reyes-Aguirre in this case. Your Honors, this is a case where the District Court found reasonable suspicion justifying a highway stop under circumstances far less suspicious than this Court has already held insufficient before. This is a case where if this Court were to sanction what the Border any innocent person driving in a rented sports utility vehicle on a highway near a recreational area carrying a cargo weight that is consistent with innocuous recreation-related cargo. That can't be right. This Court's precedent tells us that isn't right. There are two critical problems in this case, Your Honors. First, even if this Court credits the District Court's fact-finding in every respect, the totality of the circumstances here do not rise to the level of reasonable suspicion. Second, the fact-finding underlying the District Court's ruling in this case was fatally flawed in several key respects that we pointed out in our briefs. In this case, Your Honors, the totality of the circumstances makes clear that what happened here was this was a random stop based on a lucky hunch, and that is exactly what this Court's precedent says is inappropriate and can't be right. Your Honors, when I prepared for this argument, I set out the different cases this Court has put out there, the cases where they found reasonable suspicion and the cases where they did not, and a very interesting pattern arose. This Court has found reasonable suspicion in cases like this, where the stop occurred on a rural road, where the agents were aware of tips and particularized information that made it clear to them that the particular person they were following was engaged in criminal activity, and I would point Your Honors toward Díaz-Juarez and Arvizu in that respect. To the contrary, the cases where this Court has found no reasonable suspicion are in line with this case, and in many cases, even more suspicious. I would point the Court in that respect to Rodríguez, Hernández-Alvarado, Salinas, and Sigmund Ballesteros. All of those cases involve highway stops, not the rural road stops that were at issue in Díaz-Juarez and Arvizu, highway stops. In the cases where this Court has not found reasonable suspicion, this Court did not sanction the kind of analysis that the agents engaged in in this case, where the driver looked ahead, the driver looked to the side, the passenger was slouched, the passenger looked nervous, factors that can, quite frankly, apply to any driver on any highway in Southern California. In this circuit, these factors have never been enough, and they're not enough in this case. Did you – would you characterize this as a highway? I've looked at the photographs. Yes, Your Honor. This is Highway 78. This is a highway. No, I'm talking about the appearance of it. It looks like a two-lane country road. Your Honor, I think that that's a critical mistake the district court made in this case. I'm talking about the photograph. Yes, Your Honor. What does the photograph depict? Your Honor, this is a highway that goes through the desert. We have to remember this is right – That's the label you're giving it, but I'm asking you, what does the photograph depict? Isn't it a two-lane road in the desert? It is a two-lane highway, Your Honor, and it is in the desert. That's correct. It does go through an area of the desert that may be characterized as rural. However, I would point, Your Honors, to the record where it talks about the different things that are linked by this highway. This is a highway that links several major cities. This is a highway that links cities to major interstates. This is a highway that serves as a commuter route to a large state prison, a sugar factory. This is a highway that serves as a direct route to the Glamis Sound Dunes, which is the largest off-road recreational area in the United States, an area used year around by people using precisely the type of vehicle at issue here. It's also a highway where numerous smuggling arrests have been made, and it's a few miles from the Mexican border. Isn't that true? Your Honor, that's true. And this Court's case has been careful to point out that you can say the same for most highways in Southern California. Most highways in Southern California, we can say with some certainty, are used for smuggling and are maybe even used for smuggling with some frequency. But that cannot mean that under the Fourth Amendment we can give our Border Patrol agents license to stop a validly registered rented sports utility vehicle driving the speed limit, driving on a highway, driving near a recreational area with a cargo weight consistent with innocent behavior. That simply can't be enough, because if it is, then any vehicle matching those specifications can be pulled over with impunity on many highways in the Southern District of California, many of the highways that share characteristics like this one. And again, I would point to the cases that I mentioned, Rodriguez, Hernandez-Alvarado, Salinas, Sigman-Ballesteros. These highways do in fact run through rural areas, but they are also highways that are used for many innocent purposes, commuting, moving from the border areas to the interior areas of the country. It simply can't be right that just because a highway goes through a rural area, the Border Patrol agents have license to stop whoever they please. In this case, Your Honor, I would also point to the factors the District Court found important in this case and the factors the agent found important, and in particular the heavily-laden vehicle that the agent referred to in this case. The defense went out to this area with the exact same car and performed an experiment that showed that at most this agent viewed a one-inch difference from, I believe the closest he ever got in the record was one and a half car lengths from my client's vehicle. Now, it's true that in Arvizu and the cases of this circuit as well, the experience is an important factor that this Court has to look at, but I would submit the kind of experience those cases are talking about is the experience that's related to legitimate law enforcement inferences, the experience related to getting tips, receiving intelligence from other officers. It simply defies belief that this agent from a car and a half away at the closest could have noticed a difference that the defense investigator, who's an experienced mechanic, said simply was not visible to the human eye. But the District Court apparently concluded that the officer was truthful. Your Honor, that's correct. And if it is true, if it is true, if you credit that finding, which I have challenged as being clearly erroneous. Well, we have to credit it, don't we? Your Honor, as I argued in my briefs, I think that was a clearly erroneous fact-finding based on a credibility determination that was flawed. In any event, at most... But don't we have to look the evidence in the lies most favorable to the government in this case? Your Honor, this Court can assess the fact-finding underlying the District Court's determination here under the clearly erroneous standard, and I've laid out why I believe it was clearly erroneous. The District Court, first of all, your Honor, as I mentioned in my briefs, the District Court appeared to import a credibility finding from a prior hearing to bolster the agent's testimony in this case, which was inappropriate. In any event, we have at most here an agent who observed less than an inch difference, or at most an inch difference. Well, let's put that aside for a minute. Even if the agent made a mistake, and he thought that this vehicle was some of his own, you said that this is a sports area. Wouldn't most vehicles if it was going out to the sports area be heavily loaded anyway? So isn't that really an irrelevant issue? Isn't that possibly an irrelevant issue? I believe it is, your Honor, and again, that's why I argue that even if this Court fully credits all of the District Court's fact-finding, even if this Court fully credits all of the District Court's fact-finding, I really believe that his testimony alone was not reasonable suspicion here, under the totality of the circumstances. Your Honor is correct that I imagine that most campers and off-road users have cargo in their vehicles that may lower it by an inch, that may lower it by more. That doesn't give the Border Patrol license to pull over a vehicle that's otherwise behaving lawfully in every respect. What time of day was this? Your Honor, this was 5.30 p.m. on a Monday, and there is record evidence that this was a road that was used to commute again to that state prison and again to the sugar factory. We're talking about 5.30 p.m. on a Monday. We can infer rush hour from those facts. This is not one of these cases. Wasn't there evidence as to the number of cars that went by this point? Your Honor, the evidence was somewhat ambiguous. With some, I would say, leading on the part of the government, the agent did say that now and then it would be 5 or 10 minutes before he saw a car, and that Mondays were less busy than the weekends. This is not compelling evidence that this is anything but what it was, a highway Monday on a 5.30, a commuter route. So in this case, Your Honors, there simply wasn't the type of statistical evidence that we can glean that this was anything but a highway. To the contrary, the evidence shows this was a road that linked many major areas and that linked this highway to other highways in the state. Your Honors, I think I have about 14 seconds, if I may reserve for rebuttal. Thank you. Good morning. Carlos Arguello on behalf of the United States. With respect to the issue of the area, Highway 78, and whether or not it's a well-traveled road during the weekdays, the record was made clear by the agent when he was asked how busy does this area get during the weekends, I'm sorry, during the weekdays. Agent Attili said it's pretty slow. In fact, he said, quote, it's not busy at all. And as counsel just indicated, there are stretches of time, five to ten minutes, where he might not see one motorist. And when he was asked during the weekday, when he was asked another time during the weekday if it's ever busy, he says, not really, no. And one of the important paradigms of this type of Fourth Amendment analysis, members of the panel, is most of these observations on Highway 78 are largely going to consist of innocent activity. It's going to be very rare the case that you have heads bobbing up and down out of the SUV, or somehow or another some obvious screaming factor that is indicating that there is criminal activity afoot. With that in mind, in this case, you have Agent Attili, who's pretty much an expert on these cases, because he's been out there for so long. And on that stretch of roadway, he's been there 17 years. In fact, it's very difficult to find one can infer a more trained and experienced agent out there. And again, to highlight, as the paradigms of reasonable suspicion, is many of these observations can be meaningless to the untrained observer. But with the experience of this officer, which becomes significant, the officer's entitled to make permissible deductions. Well, what you're really saying, then, is that if the officer with experience thinks there's something wrong, even though a hundred other people, including judges, would find nothing wrong, that it's okay as a search. And that just leaves the Fourth Amendment outside. Well, actually, Your Honor, it still has to be objectively reasonable factors, the facts that he actually saw. And one of the important lessons that we learned from the cases that this Court has reversed findings of reasonable suspicion is the government and the agents better be prepared to back these factors up, to back up these observations with sufficient foundation. In other words, there are cases where the Court has said, we're not going to accept the fact that you call this a notorious alien smuggling route unless you tell us why. You can't make these bald-faced assertions unless you tell us specific factors producing the sufficient foundation to make this reasonable. And I did bring one of the exhibits, too, Your Honor, if the Court is interested in looking at several photos of the area, of the sand dunes area and the desert, that have different photographs from different angles. Well, is that part of the record? It's exhibit two, Your Honor, yes. May I show the Court? I hate to tell you, but outside of the desert, it looks like North Dakota. It's a beautiful place, Your Honor. I saw some subdividers in the background, though. I'm sorry, Your Honor. The joke, the joke. I'm sorry, it went over my head. But, Your Honor, considering it was the start of the baseball season this week and there was a concern about what the officer can see and that others can't see, it's not that we're saying this is magic or they have some special voodoo to this reasonable suspicion equation, but much like a baseball umpire at the major league level can tell what a strike is when it hits the black of the plate, the outside of the plate, whereas if they were to put me or somebody else that's less trained couldn't tell the difference between a 95-mile-an-hour fastball coming at that area, whether it's a strike or not. Yeah, but we do balls and strikes, too. That's true, Your Honor. That's how you get to be Chief Justice, you call balls and strikes. We call foul balls, too. Absolutely, Your Honor. Would you summarize the objective factors that cause this officer to have reasonable suspicion? Well, first of all, it's his experience and the fact that he also has over 1,000-plus alien smuggling stops in the 17 years he's been in that area. Considering Highway 78, as our visa says, the VARVISA case, the Supreme Court... He's got 1,000 alien stops, they call them contraband, right? Actual aliens. Actual aliens. Do we keep statistics on how many times he might stop a car and there's nothing there? No, Your Honor, I've thought about the same thing, too, but no. I guess the only way you can maybe see if that's going on is my complaints in the area or matters that are brought to our attention in terms of civil rights violations that may be taking place. But going on with respect to the factors, I'll summarize it as the Court's well aware of the facts, but the fact that Highway 78, the one lane going in each direction is 15 to 20 miles north of the border. The testimony was that many of these instances drop houses where aliens are dropped off in Calexico or thereafter brought up through this area to take them to larger cities. The fact that the checkpoint east of the agent's location was closed that for a few months. And in there, in the agent's experience, the highway is used because it circumvents other checkpoints that are in the area. The fact that on the prior activity on Highway 78, that there were in excess of 20 alien smuggling loads in the area, in the prior two months, and that was just for the sector belonging to the agent, of which the agent was a member. And also from the El Centro sector, there were another 20 to 30 alien smuggling loads just in the previous month. And the testimony was that it was almost every day that they were stopping a motorist where they found aliens. Not to mention there were also contraband stops as well. The way to dip down appearance of the car, the fact that it dipped lower, he had two and a half to three miles to make this observation. Isn't that, I want to go back to Judge Bright's question, isn't that the only factor that the officer relied upon that's really objective other than his prior experience and all his knowledge about all the prior arrests? And as Judge Bright asked earlier, wouldn't any vehicle going to a recreation area that had 200 pounds of clothing, food, or camping gear, be then subject to a stop? Two answers to that, or two parts to that question, or to the answer. First, the other objective factors were the appearance of the drivers and the, or the fact that there were aliens in the area. The fact that the vehicle was a rental, a PV holding corporation, a subsidiary of budget, and the agent's experience in those cases. We've held, though, that driving while Hispanic is not enough. Right, but this is simply going to rental. What was the appearance then beyond being Hispanic? On the record, there was no issue of it being, of the passengers or the driver being of Latin descent. That was never asked, it was never brought up. What was the appearance then that established objective reasons to stop the car? The agent noticed that the driver was pretty much more tense, that he was tight, that he was looking straight ahead, and that the passenger was slouched. Where in his experience, he has seen this, that it can be a factor consistent with persons that are involved. But again, he's not looking at it as one factor, and that's the tell-all, and he pulls this car over immediately. It's basically an ingredient into the whole recipe of his observations regarding reasonable suspicion. But, I forgot the second part. Well, we'll give you time. So, the driver is looking ahead, is that it? Correct, Your Honor. But again, we're not trying to parse this out and say that that was a major factor or something that gave him immediate cause to pull this car over. It was more, it's the totality, it's all the factors together. And again, reasonable suspicion is a standard that's lower than, as the Socolow case tells us, lower than a preponderance of evidence. And as a matter of fairness, the court was asking about the observations of the agent. The government did try to call another agent to testify regarding the balance. The government made a proffer that there was another officer or another agent that also had seen a balance of evidence. Or had seen this car and made similar observations because, in fairness to the defendant, should be able to hear from the other agents as well. But the district court would not allow the government to call that extra witness as it appeared to be, in the district court's mind, inappropriate bolstering. Thank you. Thank you. I think I have 14 seconds. I better make this quick. I don't want to get you down there. Give her 14 seconds. Thank you, Your Honors. I just want to point out on this record, the week before, this same agent had been in the very same courtroom testifying to the very same factors that he used to pull over another person at the very same area. Like this court found in Rodriguez, this is the prefabricated or recycled profile of suspicious behavior that simply strains the Fourth Amendment beyond what it is. We're asking that the court reverse the reasonable suspicion determination in this case, in line with this court's precedent, so that we don't stretch the reasonable suspicion case law in this district so far that innocent people are swept up, stopped, and detained based on a lucky hunch.  Thank you.
judges: Bright , Pregerson, Alarcon.